**STATE, Plaintiff-Appellee, v. FOUTS, et al., Defendants-Appellants.**

Ohio Appeals, Second District, Montgomery County.

No. 1913. Decided January 25, 1947.

Mathias H. Heck, Prosecuting Attorney, and Fred M. Kerr and William H. Wolff, Assistant Prosecuting Attorneys, Dayton, for plaintiff-appellee, State of Ohio.

Herbert M. Eikenbary, Dayton, for defendant-appellant, Albert Fouts.

Harold J. Bandy, East St. Louis, Ill. and George A. Hurley, Cleveland, for defendant-appellant, Virgil Summers.

Albert H. Scharrer, Dayton, and William Scott Stewart, Chicago, Illinois, for defendant-appellant, George C. Moran.

## OPINION

By WISEMAN, J.

This is an appeal on law from the judgment of the Common Pleas Court of Montgomery County, Ohio, wherein the de-

fendants, Albert Fouts, Virgil Summers and George C. Moran were jointly indicted, tried and found guilty of armed robbery.

The gist of the charge is that on June 28, 1946, while armed with guns, they did, unlawfully and wilfully, make an assault upon one John Kurpe, Jr., and unlawfully, and with force and violence, and by putting the said John Kurpe, Jr. in fear, did steal and take Ten Thousand Dollars ($10,000.00) from the said John Kurpe, Jr., being the personal property of Gabor Silas. To this indictment each of the defendants interposed a plea of not guilty and filed notice of alibi. All three defendants were found guilty as charged in the indictment and join in the appeal, and assign as error: (1) said verdict is contrary to law; (2) said verdict is against the manifest weight of the evidence; (3 and 4) the failure of the trial court to discharge the jury and declare a mistrial; (5) for failing to charge the jury upon the included offense of assault to rob; (6) for all other errors apparent upon the face of the record.

The undisputed facts in this case show that Gabor Silas conducts a tavern at Moraine City, which is located a few miles south of Dayton near Frigidaire Plant No. 2; and that on Fridays he customarily cashed pay-roll checks for workmen at said Plant; that John Kurpe, Jr. was the son-in-law of Gabor Silas, the owner of the tavern and they both kept large sums of money in safe deposit boxes for use in cashing pay-roll checks; that the safe deposit boxes were in the West Side Branch of The Winters National Bank and Trust Company, located at the corner of Third Street and Broadway, Dayton, Ohio; that John Kurpe, Jr. lived with Gabor Silas, on Red Haw Road, which is located in the northwest part of the city of Dayton; that on June 28, 1946, John Kurpe, Jr. left his residence at about ten o'clock A. M. in a Ford coupe; that he drove to the bank and took from his safe deposit box Ten Thousand Dollars ($10,000.00) in new Ten Dollar ($10.00) bills, which the teller of the bank exchanged for old Ten Dollar ($10.00) bills, and delivered them to him in two packs, which he placed in his shirt; that he then drove south on Broadway in the direction of the tavern; that near the outskirts of the city of Dayton, traffic going south on Broadway is directed over Dona Avenue for a distance of several squares, and then back again to Broadway; that, as he was proceeding on Dona Avenue he was required to slow down for a truck which was proceeding ahead of him; that at this moment a large Buick sedan overtook him and cut in ahead of him, causing him to turn to the curb and stop; that two men with guns in their hands jumped out of the sedan and covered him; that one robber entered

his auto on the driver's side and the other robber entered his auto from the other side and forced Kurpe's head down between his knees and placed a gun against the back of his neck; that one of the robbers drove Kurpe's auto south on Broadway and over Vance Road for quite a distance and then into a lane leading into a woods; that a short distance up the lane the robber stopped the auto, forced Kurpe out of the auto and the two robbers then took from him the Ten Thousand Dollars ($10,000.00); that the robbers wore white and blue striped caps similar to those worn by railroad workmen, and one of the robbers had on a dungaree jumper; that one robber wore canvas gloves and the other, gloves which looked like leather gloves; that they took off Kurpe's shoes and threw them across a creek and forced Kurpe to lie on the ground face down, whereupon they bound his hands behind him and his feet with adhesive tape and placed adhesive tape across his mouth; that within a few moments Kurpe heard another large auto drive up the lane, make a turn and stop; that he heard a door on said auto open and shut and the auto speed away; that he loosened the tape, and seeing his own Ford coupe and the large Buick sedan, which he observed was used by the robbers on Dona Avenue, parked in the lane and the robbers gone, he left the scene and notified the police.

The record further shows that Fouts resided at 502 West Fourth Street, Dayton, Ohio; that on the day in question Summers resided in Evansville, Indiana, and Moran in Henderson, Kentucky, which is approximately seven (7) miles from Evansville; that between the date of the robbery and the day the defendants were arrested Summers moved from Evansville to Henderson, Kentucky; that all three defendants were apprehended on July 6, 1946, at their respective residences.

The undisputed evidence shows that on May 5, 1946, Fouts wrote a letter to Summers as follows:

May 5-46
10 00 A M

Friend "Doc Etc.;"

I received your note after I returned from the Derby—so congratulations folks upon the new arrival.

Doc & "Pop"—I would very much like for you & "old" man to be over this way by 9 30 A. M. Wednesday,—Starting Wednesday A. M. the issue starts to roll.

I want you folks to see those conditions for the one week—I and also the author will also check on last Wednesday Thursday & Friday's events, to see if things are regular.—(By the way—bring with you also a working mans out fit—like you did up Ft Wayne way—it will make it better to see things.)

I would like that you stay over from Wed A. M. till Fri noon—I'll arrange for you folks lodging

over

(Other side of page)

(2)

so be here by 9 30 A. M. Wed—then we'll go into details.

I'll be waiting here at the house Wed. so give me a ring when you get in and I'll meet you.—So get in touch with the "old" man.

Regards from all to all.

Mon—

The evidence shows that Summers was nicknamed "Doc;" that "Pop" and "Old Man" referred to Moran, and he so testified. That both Summers and Moran testified that within a few days after Summers received the letter they came to Dayton and met Fouts, and stayed at the residence of Fouts one day or a part of two days, after which they returned to their homes. The evidence further shows that on Tuesday, June 25th, Summers and Moran drove to Dayton in Summers' Buick sedan; that they stayed at the Fouts residence from Tuesday evening until Friday; that a fourth person, whom Summers and Moran called "Johnny," who has not been apprehended, also was in Dayton during the greater portion of this time, and stayed at the Fouts residence.

The evidence shows that at the time of his arrest Fouts denied knowing Summers or Moran or that they had been in Dayton recently; that Summers denied knowing either Fouts or Moran and denied being in Dayton; that Moran refused to make any statement in regard to his being in Dayton or knowing either Fouts or Summers. The evidence is undisputed that Summers used his Buick sedan while he was in Dayton, which bore an Illinois license plate; that his auto had been seen and was well known by agents of the Federal Bureau of Investigation; that on the night of June 25th, or early morning of June 26th, a four-door, 1939 Buick sedan, owned by Dr. Anson Hayes of Middletown, was stolen from his garage in Middletown; that the stolen Buick sedan bore an Ohio license, A-31-H; that the three defendants, together with a fourth man, were seen using this stolen Buick sedan, together with Summers' sedan, on the streets of Dayton; that the stolen Buick sedan was the auto which was abandoned by the robbers in the lane near the Ford owned by Kurpe at the time the robbery took place.

The evidence presented by the State clearly shows that all three defendants had been under surveillance by the F. B. I. for quite some time; the F. B. I. agents were watching the resi-

dence of Fouts in Dayton, Summers in Evansville and Moran in Henderson, Kentucky. Fifteen agents of the F. B. I. were called as witnesses by the State; some of these agents were able to identify one of the defendants, some two of the defendants and some all three defendants. These agents were acquainted with the make and type of autos used by the defendants and their license numbers.

Only one of the defendants, to-wit: Summers, was identified by Kurpe as one of the two men who actually robbed him; he could not identify either Fouts or Moran as the other robber. It is obvious that four persons were involved in the robbery, the two robbers who jumped into Kurpe's auto and took the money later in the lane where they had parked, one person who drove the stolen Buick which followed the robbers into the lane, which auto was abandoned at the scene of the robbery, and a fourth person, who later drove into the lane in another automobile to pick up the other three participants, and immediately speeded away from the scene of the crime.

What is the evidence which connects Fouts and Moran with this robbery? It was stipulated by counsel that if the cook and housekeeper of Fouts were called they would testify that on Tuesday, June 25th, three men arrived at Fouts' residence; that they remained there until Friday, June 28th; that they were known as George, "Doc," and "Johnny." The agents of the F. B. I. watched the residence of Fouts at different periods of the day, at some periods one agent and at other periods two agents. The testimony given by these agents and several other witnesses covered most of the time from Tuesday evening until Friday morning, and in substance is as follows: On Tuesday evening an agent of the F. B. I. observed a 1939 Buick sedan, bearing an Illinois license, and always identified as Summers' auto, parked near Fouts' residence. That on Wednesday morning, June 26th, an agent of the F. B. I. observed Summers and two other men, whom he could not identify, leave Fouts' residence and drive away in Summers' auto. The witness followed them to Third and Williams in an auto, where the two men and Summers parked their auto and walked around several blocks near the intersection of Third and Broadway where the bank is located; that later they drove their auto north on Broadway to Harvard Boulevard, across Harvard Boulevard to Salem Avenue, then north on Salem Avenue to Red Haw Road, near the residence of Silas and Kurpe. The Summers auto then was driven around several squares in the vicinity of Red Haw Road and Salem Avenue, and then retraced the route first taken continuing down Broadway through Dayton to South Broadway and the Spring-

boro Pike, circling around and parking near Silas's Tavern; that the three men left the auto for about fifteen minutes, after which the three men again entered the auto and retraced the route previously taken going north on Broadway, at all times followed by the witness in an auto; that as the witness arrived at South Broadway and Dona. Avenue, where the north-bound and south-bound traffic is separated he observed Summers' auto headed south again where the trail was lost. On Wednesday evening, at about 7:30 o'clock two agents of the F. B. I. observed three men leave Fouts' residence and enter Summers' auto; the driver being identified as Summers; that they drove out Germantown Street, and took up Route 4 through Germantown and Middletown to Le Sourdsville Lake, followed by the two agents in separate cars; that at Le-Sourdsville Lake the agents ceased trailing Summers' auto. It was on that night that the Buick sedan, owned by Dr. Anson Hayes of Middletown was stolen from his garage, bearing Ohio license No. A-31-H. That on Thursday morning, at about one o'clock the Summers Buick sedan and a Buick sedan bearing Ohio license No. A-31-H were seen by two agents of the F. B. I. to approach and park in front of the Fouts residence. The driver of Summers' Buick was identified as being Summers; that Moran got out of Summers' auto and he, together with Summers and the driver of the stolen Buick, entered Fouts' residence; that within a few minutes thereafter, Fouts, Summers and Moran and a fourth man left Fouts' residence and entered the two sedans; the unidentified man taking the driver's seat in the stolen Buick and Summers taking the driver's seat in his own Buick sedan; the two agents of the F. B. I. followed the two Buick sedans to a filling station on the corner of Fifth and Broadway where both autos were serviced; that the service man at the filling station identified Summers and Moran in the Buick bearing an Illinois license and Fouts and an unidentified man as the occupants in the Buick bearing the Ohio license; that the two Buicks left the filling station and were driven north on Broadway, followed by the two agents of the F. B. I., across Harvard Boulevard and up Salem to Red Haw Road, entering the intersection of Red Haw Road and Salem Avenue, where they stopped the autos and turned out the lights, which was near the residence of John Kurpe: that within a few minutes the two Buicks were observed moving on Red Haw Road in an easterly direction, whereupon the trail was lost; that at about two o'clock on the same morning Fouts and several other men, with two autos, were observed by two witnesses, both of whom knew Fouts and one of whom conversed with Fouts at that time in the alley in the rear of the resi-

dence of his mother, who had died a short time before, which was located at 3039 North Main, in the northern part of the city of Dayton; that one of the autos was placed in the garage in the rear of his mother's residence, and Fouts and the other men drove from this location in the other auto; that at about 2:30 o'clock on the same morning, Summers' Buick alone was observed parked in front of Fouts' residence.

On Friday morning, June 28th, the day of the robbery, at about 9:30 o'clock, Summers was seen driving his Buick north on Robert Boulevard, a short distance from Fouts' residence; that Fouts and Moran and a fourth unidentified man, were in the auto; that they drove over West Third Street bridge to .Sunrise Avenue, and then over Riverview Avenue to McKinley Park near the Art Museum, where the trail of the F. B. I. agents was broken; that at about 10:00 o'clock on the same morning a witness who knew Fouts and who lived near the residence of Fouts' mother, observed Fouts and other men, in an auto passing the mother's home. The robbery took place about 10:30 o'clock on this same morning. The witnesses who testified supported their identification of the individuals by describing them in age, weight, height and manner of dress.

The evidence further shows that at the time of his arrest there was found in the possession of Fouts One Thousand Dollars ($1,000.00) in Ten Dollar ($10.00) bills, hidden in a secret chamber in the ceiling of a closet in his living quarters, also, at the time of his arrest, Fouts gave to his landlady, in the presence of one officer, twenty-eight (28) Ten Dollar ($10.00) bills, which money was immediately taken by the officer; that two loaded Colt revolvers were found in possession of Fouts, a number of pairs of canvas gloves and one leather glove.

In support of their defense, Moran and Summers offered evidence to show that at the time of the roberry they had already left Dayton and were driving on their way home on the highway between Aurora and Evansville, Indiana, a distance of approximately seventy-five (75) miles from Dayton. Moran, who admitted having been in Dayton several days previous and up until Friday morning, testified that he and Summers left Dayton in Summers' auto at 8:30 A. M.; that they were in Aurora, Indiana, at 10:30 o'clock that morning. Mrs. Summers testified that her husband, with Moran, arrived in Henderson, Kentucky, at the Moran home, at about 1:30 P. M. There was testimony introduced on behalf of Fouts that about 10:20 o'clock A. M., on the day of the robbery, he and two ladies entered the White Owl Cafe on West Third Street, Dayton, a few blocks from his residence, and that he was still in said Cafe at 11:30 A. M.

On rebuttal the State produced several witnesses to contradict the testimony offered on behalf of the defendants. An agent of the F. B. I. and a county patrolman of Henderson, Kentucky, testified that they were watching the residence of Moran on June 28th, and that Moran and Summers arrived at the Moran home in Summers' auto about 7:00 P. M., Dayton time; the second F. B. I. agent contradicted the testimony offered in behalf of Moran and Summers in part. Several witnesses were called by the State to rebut the testimony offered on behalf of Fouts. Obviously if the jury were to believe the testimony of the defense witnesses, a conviction could not stand. Apparently, the jury rejected the testimony offered on behalf of the defendants and believed the testimony of the witnesses offered by the State. Both direct and circumstantial evidence was presented in abundance. Direct proof strongly supports the conviction of Summers; there is much direct and circumstantial evidence presented to connect Moran and Fouts with Summers in acts and conduct leading up to the robbery, and circumstantial evidence involving them in assisting in the escape of the robbers; and in regard to Fouts in the recovery of articles and money at the time of the arrest.

After reading the entire record, consisting of seven hundred and forty-eight (748) pages, we are of the opinion that there was sufficient evidence to warrant the jury in finding that the letter written by Fouts inviting Summers and Moran to visit him in Dayton, was for the purpose of planning the robbery; that the clothes mentioned in the letter referred to the striped clothing and caps worn by the robbers; that Summers and Moran participated in stealing the Buick sedan at Middletown; that Fouts, Summers and Moran all participated in secreting and using the stolen Buick; that driving over the streets of Dayton which Kurpe customarily drove over in going from his home to the bank and from the bank to Silas's Tavern, on two occasions by Fouts, Summers and Moran, and surveying the territory around the home of Kurpe, the bank and the tavern, was in furtherance of an agreed plan on their part to rob Kurpe; that the two robbers who jumped from the sedan on Dona Avenue were assisted by two other persons, one, the driver of the stolen Buick, and the other the driver of Summers' Buick; that the money found in the home of Fouts was money taken from Kurpe; that Summers and Moran did not arrive in Henderson, Kentucky, until approximately eight (8) hours after the robbery took place. The evidence strongly supports the State's contention that Fouts and Moran were aiders and abettors. Under the provisions of §12380 GC they could be found guilty as principals. The Court very

properly, under the evidence in this case, charged the jury on the law as to aiding and abetting.

After a careful consideration of all the evidence we are not prepared to say that the verdict of the jury is contrary to the manifest weight of the evidence or contrary to law.

The defendants were either guilty of armed robbery as charged, or not guilty at all, under the defense interposed and the evidence adduced. They could not be guilty of a lesser offense under the evidence. The Court did not commit error in refusing to charge on the lesser offense of assault with intent to rob.

The defendants urge a reversal on the ground that the Court committed prejudicial error in refusing to discharge the jury, in permitting said case to continue after certain publicity appeared in the Dayton newspapers, which the defendants claim prejudiced the minds of the jury and deprived them of a just trial. The record in this case shows that during the trial there appeared in the daily newspapers published in Dayton news articles in which the defendants were accused of being involved in the burglary of the Ansonia Bank. These articles appeared with large headlines, accompanied with photographs of the defendants and other persons accused of being gangsters. The record shows that the trial began August 12th and continued through August 26th. Counsel for the defendants filed motions on August 20th to discharge the jury after such articles first appeared on August 16, 17 and 19. The motions were supported by affidavits of counsel. The Court overruled the motions. Again, similar articles appeared in the local newspapers on August 23, 24 and 25. At the close of the case on August 26 counsel for the defendants again filed motions to discharge the jury, which were supported by affidavits of counsel. The Court overruled the motions. The record shows that the jurors were never locked up, but were permitted to separate each day and at recesses taken at noon time. The contention of counsel for the defendants is that such articles were calculated to prejudice the minds of the jurors and deprive them of a fair and just trial. Conceding, but not deciding, that such articles if read by the jurors would have prejudiced the minds of the jurors against the defendants, and defeated the ends of justice, does the record show that the Court committed prejudicial error in overruling the motions? No effort was made to interrogate the jurors either by the Court or counsel. No request was made by counsel that the Court determine whether such articles were seen or read by the jurors. The record is silent on this matter. The Court

will not presume that the jurors saw the newspaper articles, read them and were prejudiced by them. The Court was careful at each recess to caution the members of the jury about discussing the case, etc., or reading newspapers or listening to radio broadcasts. Unless and until the contrary is shown of record, we are required to adhere to the well-established principle of law that it is presumed that the jurors obeyed the instructions and admonition of the Court. In passing on this matter on review this court will not indulge the presumption that the jurors disobeyed the instructions of the Court. Defense counsel cite the case of Meyer v Cadwalader, 49 Fed. Rep. 32, in which the court held:

"Where, during a trial extending over several days, the jury separating after each daily session, leading newspapers in the city in which the trial was taking place published matter calculated to prejudice the jury against one of the parties, it will be presumed that the jury saw the matter published."

The case of People v Murawski, 394 Ill. 236, 68 N. E. (2nd) 272, was also cited, in which the court held that it would be presumed the jurors read the newspaper articles. On page 239 the court say:

"Defendant in error seeks to justify the action of the court in refusing to declare a mistrial on the ground that there is no positive proof in the record that any of the jurors had read the particular article complained of."

Continuing on page 240 the court say:

"Whether the denial of the motion for a mistrial in this particular case constituted an abuse of the discretion vested in the trial court depends upon whether the record fairly shows that at least some of the jurors read the article, and the character of the article itself. We think the record sufficiently shows that the jurors had access to the issue of the paper in which the article appeared and that it cannot be said that none of the jurors read the article. The newspaper in which it appeared was the only morning newspaper published in the City of Rockford. It would be a violent presumption to say that no one of twelve men and women, having the intelligence of average jurors, would read the only local morning paper. According to the affidavit attached to the motion, the paper had an extensive circulation in the city of Rockford and the surrounding community. It is further

shown by the affidavit that the examination of the jurors on their voir dire disclosed the fact that several of the jurors were accustomed to reading this particular newspaper in their homes. We think it is not too much to say that most every juror who had access to the particular issue of the paper in which the article appeared would undoubtedly have read the account concerning the trial in which he was serving as juror. Particularly is this true where the article appeared in the home paper of the juror, which he was accustomed to reading."

In the case of Meyer v Cadwalader, the newspaper articles related to the merits of the case being tried, and in neither of the two cases cited does the record show that the court cautioned the jury about reading newspaper articles. In the case at bar the jurors were repeatedly cautioned, and the articles concerned a bank burglary, which was a matter wholly unrelated to the issue being tried.

We appreciate the importance of the legal proposition presented. Apparently the Federal Court and the courts of several of the states have held to the proposition that when such publicity appears in the daily newspapers in the city in which the trial is taking place, it will be presumed that the jurors read such articles, and that they were prejudiced thereby. However, we are not without authority on this proposition in our own state. In Ryan v State, 10 C. C. (N. S.) 497, which was affirmed without opinion by our Supreme Court in 79 Oh St 452, it was held that even though copies of newspapers appeared in the court room, which contained articles calculated to prejudice the minds of the jurors against the defendant, a motion to discharge the jury was properly overruled, where there is no evidence that the jurors read such newspapers. The court in that case refused to follow Meyer v Cadwalader, supra, and on page 502 say:

"Authorities are numerous to the effect that the reading by jurors of newspaper articles prejudicial to one of the parties is ground for new trial, but we do not feel justified in indulging in the presumption which Judge Acheson seems to have indulged, in that the objectionable articles were read by the jurors, or any of them. We feel it our duty rather to presume that the jurors were mindful of their duties and that they did not, in violation of such duties, read the newspaper publications about the case while it was on trial before them. We think it should not be said there was misconduct on their part simply because a popular newspaper gave them the op-

portunity for misconduct. There was no error, therefore, in overruling this motion."

This court approves of the holding in Ryan v State, and ▌refuses to follow Meyer v Cadwalader. Furthermore, it must be noted that under the provisions of §13449-5 GC a reviewing court is not permitted to reverse a judgment of conviction "unless it shall affirmatively appear from the record that the accused was prejudiced thereby, or was prevented from having a fair trial."

In the instant case it does not affirmatively appear from the record that the jurors were influenced or prejudiced in arriving at their verdict by the newspaper articles. In the absence of such a showing in the record the court finds that the trial court did not commit prejudicial error in overruling the motion to discharge the jury. Furthermore, we are of the opinion that the facts in this case do not fall within the provisions of §13443-18 GC which provides that "the court may discharge a jury without prejudice to the prosecution for the sickness or corruption of a juror, or other accident or calamity, * * *"

(Emphasis ours.)

We find no prejudicial error in the record relative to the admission or exclusion of evidence; neither do we find the court committed error in refusing to give special instructions to the jury before argument, which were presented by the defendants. We are of the opinion that the defendants had a fair trial, that the evidence presented supports the verdict of the jury in finding the defendants guilty as charged in the indictment and that the judgment is not contrary to law.

HORNBECK, PJ, and MILLER, J, concur.

Decided February 19, 1947.

**OPINION**

By THE COURT:
Submitted on application for rehearing. Nothing is presented in the application which has not already been considered and determined by the Court.
The application will be denied.

WISEMAN, PJ, MILLER and HORNBECK, JJ, concur.